```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                    )
      United States of America,      )  File No. 20-cr-291(1)(2)
 4                                    )              (DSD/DTS)
               Plaintiff,            )
 5                                    )
      v.                              )
 6                                    )
      Gregory Carl Koch(1),          )  Courtroom 9W
 7    Jerome David Kangas(2),        )  Minneapolis, Minnesota
                                      )  Thursday, May 6, 2021
 8             Defendants.           )  9:05 a.m.
                                      )
 9    ------------------------------------------------------------

10            BEFORE THE HONORABLE DAVID T. SCHULTZ
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                       MOTIONS HEARING

12    APPEARANCES
       For the Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
13                                  BY:  MICHELLE E. JONES
                                    300 South Fourth Street, #600
14                                  Minneapolis, Minnesota 55415

15     For the Defendant           LAW OFFICES OF PAUL ENGH
       Gregory Carl Koch (1):      BY:  PAUL C. ENGH
16                                  650 Third Avenue South, #260
                                    Minneapolis, Minnesota 55402
17
       For the Defendant           JOSEPH S. FRIEDBERG CHARTERED
18     Jerome David Kangas(2):     BY:  JOSEPH S. FRIEDBERG
                                    701 Fourth Avenue South, #300
19                                  Minneapolis, Minnesota 55415

20                                  PACYGA AND ASSOCIATES PA
                                    BY:  RYAN M. PACYGA
21                                  333 South Seventh Street, #2850
                                    Minneapolis, Minnesota 55402
22
       Court Reporter:             RENEE A. ROGGE, RMR-CRR
23                                  300 South Fourth Street, #1005
                                    Minneapolis, Minnesota 55415
24

25        Proceedings recorded by mechanical stenography;
      Transcript produced by computer.
```

1        **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3              THE COURT:  All right.  We are on the record in

4    the matter of the United States versus Gregory Carl Koch and

5    Jerome David Kangas, Criminal No. 20-291.

6              Counsel for the defendants, if you will note your

7    appearances for the record, please.

8              MR. ENGH:  Paul Engh on behalf of Mr. Koch.  He's

9    here with me, Your Honor.  Good morning.

10             THE COURT:  Good morning, Mr. Engh.

11             And counsel for Mr. Kangas.

12             MR. PACYGA:  Good morning, Your Honor.  Ryan

13   Pacyga and Joe Friedberg for Mr. Kangas, who is here out of

14   custody.

15             THE COURT:  Good morning, Mr. Friedberg and

16   Mr. Pacyga.

17             Counsel for the government.

18             MS. JONES:  Good morning, Your Honor.  Michelle

19   Jones on behalf of the United States.

20             THE COURT:  All right.  Good morning, Ms. Jones.

21             So, as I understand it, first order of business is

22   we need to arraign Mr. Kangas; is that correct?

23             MR. PACYGA:  That's my understanding.

24             THE COURT:  Come on up here, if you will.

25             All right.  Good morning, Mr. Kangas.

```
 1              DEFENDANT KANGAS:  Good morning.
 2              THE COURT:  An indictment -- well, first, would
 3     you state your full name and spell your last name for the
 4     record, please?
 5              DEFENDANT KANGAS:  Jerome David Kangas,
 6     K-A-N-G-A-S.
 7              THE COURT:  And what is your date of birth?
 8              THE DEFENDANT:  4/17/64.
 9              THE COURT:  All right.  Mr. Kangas, an indictment
10     dated December 17th of 2020 has been filed against you
11     charging you with five counts of mail fraud in connection
12     with an alleged health care fraud scheme.  Have you had an
13     opportunity to review the indictment?
14              DEFENDANT KANGAS:  Yes.
15              THE COURT:  Mr. Pacyga or Mr. Friedberg, do you
16     wish to waive the reading of the indictment?
17              MR. PACYGA:  We will waive the reading and ask
18     that not guilty pleas be entered for the counts, Your Honor.
19              THE COURT:  All right.  A not guilty plea to all
20     counts of the indictment will be entered on your behalf,
21     Mr. Kangas.
22              I believe that you have the dates already by
23     virtue of Mr. Koch's indictment order or his arraignment
24     order -- excuse me -- but, regardless, I'm not going to give
25     you -- I'm not going to read off a bunch of dates this
```

1  morning.  We will get those to you if you don't have them.

2  Okay?

3          MR. PACYGA:  Okay.  Understand.  Thank you.

4          THE COURT:  Okay.  Thank you.

5          DEFENDANT KANGAS:  Thank you, Your Honor.

6          THE COURT:  So, as I understand it, we have a

7  number of motions.  I am assuming that what we have for

8  argument is the bill of particulars and the in-camera

9  inspection motions; is that correct?  Am I assuming that

10  correctly?

11          MR. ENGH:  And *Brady*.

12          THE COURT:  And *Brady*?

13          MR. ENGH:  And we would like to talk about *Jencks*

14  for a paragraph.

15          THE COURT:  Okay.  Who will be arguing on the

16  defendants' behalf?

17          MR. ENGH:  I will be.

18          THE COURT:  All right.  Go ahead.

19          MR. ENGH:  Do you want me to stand up or should

20  I -- what's the protocol here?

21          THE COURT:  What's that?

22          MR. ENGH:  What's the protocol?  Can I stand up?

23          THE COURT:  Yes, you may.  And, yeah, go ahead and

24  push one microphone out of your way.  And go ahead.

25          MR. ENGH:  Should I keep my mask on?  Is that how

1    we're doing this?  It's up to you.

2             THE COURT:  Yeah, I guess we are.

3             MR. ENGH:  Okay.  Well, thank you for the motion

4    hearing.  This is a fascinating case for the court and for

5    the defense, and I'd like to start by introducing the case

6    to you to provide a context for why we are moving for what

7    we're moving for.  It goes a little bit beyond the

8    indictment.

9             This is a case that didn't originate with the

10   government.  It was an investigation that was conducted

11   internally by Park Nicollet Clinic, which is owned by

12   HealthPartners, and it involves Mr. Kangas who supplied

13   telephone access to patients at Park Nicollet who were on

14   the CPAP machines.  Mr. Koch was his supervisor and in

15   charge of some of the retail sales involved here.

16            They're taking the position, the government is, on

17   behalf essentially of a corporation and sitting in the shoes

18   of a corporation.  They are attempting to secure restitution

19   of a claim of $500,000, $300,000 of which was paid by Park

20   Nicollet's insurance company and $200,000, plus a little

21   change, was the deductible.  And so they've relied, in our

22   view, for the disclosures largely on what's coming from Park

23   Nicollet and the emails, such as they are, the contracts,

24   such as they are.  And so their theory is that Mr. Kangas

25   engaged in a rip-off of Park Nicollet in that he didn't

1    provide the services and was paid $500,000 and should give

2    back every cent of that pay.  Our theory is that he did

3    provide services, agreed-upon services on a 24/7 basis per

4    his contract and was paid accordingly fairly an agreed-upon

5    rate by Park Nicollet.

6         Mr. Koch for his part approved Mr. Kangas' request

7    for pay, but got nothing else back.  There is no evidence of

8    a kickback or an exchange of money between the two.  Their

9    relationship is at best a friendship, and they are not

10   terribly close.  And so there's nothing -- there's no

11   exchange of money, but that's a bill of particulars motion

12   that I want to get to.

13        So we have a situation here that is a private

14   company.

15        THE COURT:  Hang on one second, just -- at least

16   as I understand it, the general allegation is Mr. Kangas

17   billed for time not actually working in the amount of

18   38,000 hours over a period of five or six years.  Is that --

19   is that the general allegation?

20        MR. ENGH:  That's the general allegation, and we

21   dispute that.

22        THE COURT:  Yeah.

23        MR. ENGH:  So if he --

24        THE COURT:  38,000 hours is a lot of hours.

25        MR. ENGH:  Well, if you're on call 24/7 and you

1    can bill for a number of hours per call, which is one of our

2    disputes here, then it's not.

3              And in the context of the case Park Nicollet was

4    delighted to have someone like Mr. Kangas handle these

5    calls.  They had a problem.  They had a structural problem

6    in the company in that they sold these CPAP machines and

7    they didn't have enough people to service them at night when

8    they collapsed or, you know, some elderly person couldn't

9    turn on the switch.  That sort of thing happens.  And so

10   they needed someone who would be willing to be on call all

11   the time, 24/7.  And they had huge problems internally

12   staffing that, and they were delighted to get Mr. Kangas.

13   I'm not his lawyer, but they were happy to get him and put

14   him under contract, so they could solve a structural problem

15   they had at the clinic and that is to address the CPAP

16   customers.  It was a service that the clinic did provide,

17   and he provided it.

18             If he provided the service, there is a set-off

19   required in the law which mitigates the loss that they are

20   claiming.  They are claiming it's a total loss.  If he did

21   supply the services, then it's a set-off to that loss.  In

22   our view, he supplied all the services that were required

23   and there's no loss whatsoever, but that's what the fight is

24   going to be about.  And the government claims, well, there's

25   no set-off whatsoever, it's not a health care fraud case.

1    But this district has had trouble when -- the district court

2    has had trouble in the Eighth Circuit when it doesn't apply

3    a set-off.  And that's one of the reasons for our *Brady* and

4    discovery motions.

5           So that is the context of the case.  It's a

6    private lawsuit, which should have been sued privately,

7    frankly, but now I interrupt.  Go ahead.  I'm all excited.

8    I haven't got to the main thing yet, so --

9           THE COURT:  Yeah, yeah, yeah.  So run that by me

10   again, about the set-off.  Okay?  I'm not sure I follow

11   that.  Do it again.

12          MR. ENGH:  If you --

13          THE COURT:  He goes -- Kangas goes, services the

14   CPAP machine, bills an hour for whatever service he

15   provided.  What's the set-off?  Where does that fit in?

16          MR. ENGH:  He has -- he has provided the service

17   as agreed upon between him and Park Nicollet.  Okay?  So

18   they can't claim a total loss.  If he provides -- if he does

19   what they say they want him to do, they haven't lost

20   $500,000.

21          THE COURT:  Right.

22          MR. ENGH:  And that's the set-off.

23          It's the same kind of idea on bank loans.  If you

24   take a bank loan by fraud and keep the loan for a number of

25   years, the loss is the total loan; but if you take the loan

1    and it's collateralized and the bank gets the collateral

2    back immediately, then there is such a thing as a set-off.

3    And that's *United States versus Shevi*, S-H-E-V-I.  And

4    that's not even a health care fraud case.  That's just an

5    ordinary mail fraud case.

6              THE COURT:  Well, I guess what confuses me about

7    what you are saying, and it probably doesn't matter for

8    today's purposes, but maybe it does, is why is that a

9    set-off at all as opposed to "I did this thing, I billed

10   you, you paid me."  What's the set-off?

11             MR. ENGH:  Well, they're claiming that --

12             THE COURT:  Isn't your argument there's no loss?

13             MR. ENGH:  Well, they're claiming an excessive

14   billing essentially.

15             THE COURT:  No, I know, but you are saying it

16   wasn't excessive at all --

17             MR. ENGH:  No.

18             THE COURT:  -- because I did the thing, I billed

19   you for the hour --

20             MR. ENGH:  Right.

21             THE COURT:  -- or whatever, you paid me for the

22   hour.  We don't have to figure out if, you know -- if I

23   billed appropriately, the amount of the loss is zero.

24             MR. ENGH:  Right, but then the middle ground is

25   always what is the exact loss.  And so then you become

1    engaged in a Solomonic endeavor of saying what is the loss

2    here.  And so anything that we can do to mitigate the loss

3    mitigates the guidelines.

4              THE COURT:  Sure.

5              MR. ENGH:  And that impacts *Brady*.

6              THE COURT:  Right.

7              MR. ENGH:  So that's why it's all very -- that's

8    why the whole milieu matters a great deal here.

9              THE COURT:  Okay.

10             MR. ENGH:  So with that context in mind, let me

11   address briefly why we filed the motions we did -- they are

12   customized to this case -- and why you should grant them

13   paragraph by paragraph, rather than just the ordinary the

14   government will supply Rule 16, the government will supply

15   *Brady*.  We want a little more specificity here for the court

16   to help us with the documentation we need to defend these

17   two guys, who are looking at prison terms.

18             So in terms of the discovery provided thus far, I

19   have no doubt that Ms. Jones gave us what she has.  She

20   indicates that she has.  I take her for her word, of course.

21   I've known her for many years.  But there's more there.

22   There has to be more there.

23             One of the things we've asked for -- and I want to

24   make a record of this.  I don't want to be pedantic with

25   you, but, number one, I want the emails from Mr. Koch's

1    business account.  These are statements, in our view, within

2    the meaning of Rule 16.  They are in the possession of the

3    victim, who the government represents.

4         We would really like, number three, Mr. Kangas'

5    evaluations for 2013 and 2014.  These are business records

6    that should be with Park Nicollet, but were not disclosed by

7    Ms. Jones and her office.  It's really important we get

8    these not only for Mr. Kangas, but for Mr. Koch.

9         For example, in 2015 Mr. Kangas' evaluation says,

10   quotes, Jerry did a great job in helping interview clients

11   and getting the patients set up.  He has done a great job

12   taking calls for patients, received many compliments from

13   patients on how nice he is to work with.  It confirms he's

14   working, he's doing what he's supposed to do.  The earlier

15   evaluations will say the same thing.  This will be potent

16   evidence for us and the jury.  The 2016 evaluation --

17        That's Bates stamp 239, counsel.

18        The 2016 evaluation says, quote, Jerry did a nice

19   job this year taking care of patients.  His comment cards

20   have an approval rate, I paraphrase, of 95 percent.

21   Patients have found you to be, quotes, kind and patient with

22   them.  You did a great job answering the phones.  He

23   provides, according to the government's discovery,

24   24-hour-a-day service.

25        And so we want those two evaluations.  That's

1    *Brady*, clearly.

2            THE COURT:  I suspect that the fighting issue is

3    going to be, at least from the government's perspective, not

4    that this isn't relevant and discoverable information, but

5    that they don't have it.

6            MR. ENGH:  Well, I would like -- you know, that is

7    their response.  I must say I disagree.  They are

8    representing this company.  They are basically in the shoes

9    of the company.  I would like leave of the court to address

10   that in writing, because this comes up all the time.  They

11   are starting to represent these private companies.  Oh, I

12   don't have it, you go ahead and subpoena it, and then you

13   work for it, when I can get it with a phone call, that kind

14   of thing.  So I would like leave of the court to brief that

15   particular issue, if you are willing to let me do it.  Okay.

16           THE COURT:  Keep going.

17           MR. ENGH:  We would like all employment contracts.

18   There's one we saw that's abbreviated.  In our view, the

19   management was aware of the compensation system that was

20   developed and the protocols developed for Mr. Kangas.  And

21   so we want evidence of oral and written materials that

22   confirm he could bill at $120 per call, which he did.  So

23   whether the call was under an hour or 20 minutes or two

24   hours, he can bill $120.  And that's how you get -- that's

25   how you get to the 38,000 hours.  We want that.

1           You know, what happened there is in Park Nicollet

2     they had budgetary meetings all the time, every two weeks,

3     and every year they figured out whose salary was going to be

4     what, who is going to get paid, whether they got a raise or

5     not.  And Park Nicollet was well aware of how much he made,

6     and they approved how much he made every year, but we don't

7     have those documents, but we have -- you know, Mr. Koch is

8     not the only guy there.  He's sort of a lower-level manager.

9     This is a large organization with budgetary constraints, and

10    they paid him.  It's almost -- I mean, it's hard to complain

11    about what he made when you approved all his money, if you

12    ask us, but that may be a matter for trial, you know.

13           THE COURT:  Well, they're going to say, yeah, we

14    approved it because we didn't realize he was fraudulently

15    billing us.

16           MR. ENGH:  Well --

17           THE COURT:  That's what they'll say.

18           MR. ENGH:  Well, I appreciate that, and that's why

19    we have trials.

20           THE COURT:  Right.

21           MR. ENGH:  But we also need the data to prove our

22    case, so that's why I'm asking.

23           THE COURT:  Yep.

24           MR. ENGH:  I would like on expert witness

25    disclosure 60 days in advance.  You know, we believe this is

1    almost a -- could be considered or designated a complex

2    case, but we haven't made a motion to that effect, but they

3    are offering 21 days, and we will be naked as it were

4    without an expert if we get it 21 days beforehand.

5            So that's what I have on discovery.  I'd like to

6    move to *Brady*, if the court is willing.

7            THE COURT:  Yep.

8            MR. ENGH:  Okay.  This is related to discovery.

9    This is related to the in-camera review, but we would like

10   evidence that the patients were treated by Mr. Kangas.  This

11   proves that he was working, and it disproves the

12   deeply-flawed government theory that he deserved nothing.

13   These are not imaginary patients.  The time spent was not

14   imaginary.  And it has to be disclosed just because it's

15   relevant evidence, it's *Brady* evidence, and it's a set-off

16   type evidence as well under *Luna*.

17           THE COURT:  Hang on one second.  Two things.

18           First of all, are you able to keep up with him?

19           COURT REPORTER:  Yes.

20           THE COURT:  Okay.  Slow down a little bit.

21           MR. ENGH:  Okay.

22           THE COURT:  Second, if we're talking an allegation

23   of 38,000 hours of overbilling, we're talking how many

24   patients he -- and are you asking that I review in camera

25   the medical records of thousands of patients?

1          MR. ENGH:  Well, it's tempting to ask you that,

2     and I did in my motion, but here's what --

3          THE COURT:  Maybe for you.

4          MR. ENGH:  But here's -- the defense had this

5     exact conversation yesterday in a meeting.  And what we

6     propose -- Mr. Pacyga can supplement this -- is that you

7     limit the in-camera review to the time frame of the

8     indictment or the counts in the indictment, for example, or

9     ask for 20 or 30 patients of his and start there.  It would

10    be the bank examiner technique.  You have a hundred loans;

11    you look at one to see if the bank protocol is correct; and

12    then you assume the protocol is correct for the rest of

13    them.  So I would suggest that -- and I will brief this for

14    you -- that we narrow this down to the time frames of the

15    pay periods that he was paid for and the customers that he

16    treated.  And I think that would provide the court with a

17    reasonable world as it were to look at.  And we would be

18    willing to do that.

19         THE COURT:  Let me jump ahead on that issue.  I

20    had a -- I have a rather contentious False Claims Act case

21    in which I told the government that if they're going to

22    prove, you know, however many kickbacks, which was that

23    case, they weren't going to do it on statistical sampling,

24    they were going to prove each and every one, and they had to

25    do that.

1       Are you -- I guess implicit in what you are

2  arguing is, at least perhaps a suggestion, that you're

3  agreeing to do this by way of statistical sampling somehow.

4  Am I tracking or is this -- does it matter, in other words,

5  for this motion what the proof is going to be at trial?

6       MR. ENGH:  Well, I think you're ahead of me on

7  this one.  I mean, we just want --

8       THE COURT:  You want to start by seeing.

9       MR. ENGH:  Our thinking was just get -- you know,

10  have you review it; and if you think it is relevant and

11  material under *Ritchie*, give it to us; and then we will

12  decide whether we have a revisit with you or maybe it is

13  sufficient.  Without seeing it, it's hard to say.  We could

14  provide a statistical analysis, but that's a little more

15  sophisticated than we're considering right now.  And we're

16  bread and butter right here.  We just want to show that

17  patients were really happy with them and they got service.

18  And we want to call ten patients at trial, it would be very

19  powerful evidence, if we can reach them; and the only way we

20  can reach them is if you tell us through a review who they

21  are.

22       THE COURT:  Okay.  All right.  Keep going.

23       MR. ENGH:  We've asked for a grand jury

24  transcript, which describes the loss of $500,000 in error.

25  In our view, this will be used for impeachment.

1          We've asked for the Kangas employment contract,

2    oral or written, assuring that he would be paid $120 on each

3    call.  We don't have that in the discovery.

4          His employment app evaluations.  I've talked

5    about.

6          I've also talked about No. 5, Park Nicollet's

7    knowledge of his work, his pay, who made the decisions to

8    pay him, because they did.  They approved his pay.

9          And then we also request the internal

10   investigation that was done in this case.  The records do

11   indicate one was facilitated by in-house counsel and payment

12   of the claim.  This is an interesting one, in whether it's

13   privileged or not privileged.  And I'd like to write about

14   that for you as well.  We don't -- we think there's enough

15   disclosure in the record to obviate any privilege.

16         And, finally, we've asked for communications with

17   the FBI and Park Nicollet concerning Mr. Koch's role or lack

18   thereof and confirmation from Park Nicollet that he received

19   no kickback, which he didn't.

20         So those are our specific *Brady* requests.  And

21   then some of the -- like 9, 10, 11 are kind of the ones you

22   usually have.  I don't need to address those.

23         The third --

24         THE COURT:  Again, the fighting issue on that is,

25   Is it in their possession, right?  I mean --

1          MR. ENGH:  Well, then that's why I want to write

2     about what they possess.  I mean, they have complete access.

3     This idea that is advanced by friend and esteemed counsel

4     that we should just subpoena these things is a bit unfair to

5     the defense.  We'll be back here with quashing motions,

6     because that's what they'll do, and I can't subpoena medical

7     records anyway.  So, you know, we should -- some of these

8     things should just be ordered.  They can comply under *Brady*.

9     They have to give it to us.  We don't have to subpoena.

10         THE COURT:  Okay.

11         MR. ENGH:  In terms of the in-camera review,

12    again, the claim is that Kangas was paid for work, quote,

13    unquote, he did not perform.  This is -- quotes, he did not

14    perform.  This is from the government's brief at page 6.  He

15    did perform the work.  And so we want to counter that

16    erroneous claim, and we want to show the patients were

17    indeed treated.

18         I've talked myself out on this motion.  I think

19    we've already argued the merits of it.  We can limit it.

20    But we really do need that evidence, and there's no other

21    way I can get it.  I can't subpoena it, and it's all

22    privileged, and it would be extremely relevant for the jury

23    to know that he actually performed the services he got paid

24    for.  I can't imagine a more relevant piece of evidence than

25    that.  And we -- our plan is not only to call the patients,

1    but to submit the records and also to submit their

2    evaluations of how pleased they were with his work.

3              And I'm not arguing for Mr. Kangas, but

4    Mr. Kangas' fate is tied to Mr. Koch's fate.  And so they

5    are charged together in this case; and how he goes, Mr. Koch

6    goes as well.  So they are both tied together in terms of

7    the treatment of these patients.

8              In terms of the bill of particulars, you know, the

9    gist of the charge is that Mr. Koch obtained, quotes, money

10   or property within the meaning of the mail fraud statute, 18

11   U.S.C. 1341.  And I'm just trying to find out what money or

12   property he obtained as a result of this scheme.  And the

13   government basically cut and paste their indictment into

14   their memo.  I appreciated reading it again, but it doesn't

15   show what he gained in terms of money or property.  And

16   that's what I want.  It's a very simple request.  All they

17   have to do is show me.  I can't find it anywhere in the

18   discovery.  And all I got from the government is thousands

19   of pages of credit card records that don't show that.

20             In terms of the 404(b) motion, we would appreciate

21   21 days.

22             The *Jencks*.  You know, this is a discussion we

23   have in every case.  This idea that you can do it three days

24   before trial is imminently unfair and always has been.  The

25   government has relaxed that quite a bit.  And I cited one

1   case where I -- it's the magazine case going on.  We have

2   *Jencks* a year before trial, and it's a great advantage for

3   the government because it's caused like 40 guilty pleas

4   already.  So the idea that we're going to harass witnesses

5   is just an anathema, and it's a great advantage to them.  I

6   don't think we're going to settle, but I don't understand

7   the policy, frankly.

8           And I appreciate you're going to say that -- well,

9   go ahead.  I interrupt.  I know what you're going to say,

10  but say it anyway.

11          THE COURT:  I'm going to say it.  Okay?  My

12  understanding is it doesn't matter what I think or feel.

13  What I understand is, the law is pretty clear, I cannot

14  order disclosure of *Jencks* before the witness gets off the

15  stand.  That's point number one.

16          Is that -- that's what you thought I was going to

17  say, right?

18          MR. ENGH:  That's exactly what I thought you were

19  going to say.

20          THE COURT:  Now I will tell you this.

21          And Ms. Jones I don't think has been before me

22  before, so she hasn't heard this, but I suspect you've heard

23  it elsewhere.

24          There's a question as far as I can tell in the

25  Eighth Circuit of whether *Jencks* trumps *Brady* or *Brady*

1    trumps *Jencks*.  I have been clear in my orders that you

2    can't withhold *Brady* information on the theory that it's

3    also *Jencks* information and need not be disclosed until

4    whenever they choose to disclose *Jencks* material.

5              Does this fall into or what part of what you are

6    seeking falls into that category?

7              MR. ENGH:  A lot of it does, mainly because

8    Mr. Koch's role is so de minimis here and his reward is

9    nothing, and there has to be reference to that in all those

10   statements.  It has -- it has to be there.

11             THE COURT:  Okay.  Okay.

12             MR. ENGH:  I think the rough notes I'll submit on

13   the record.

14             And I've said my peace.  This is just a really

15   interesting case where the civil law collides with the

16   criminal law and --

17             THE COURT:  Yeah.

18             MR. ENGH:  And when the government adopts a case

19   from a private corporation, sometimes it doesn't turn out

20   too well.  And when -- I mean, I'm not privy to everything

21   the FBI did or what Ms. Jones did, but, you know, there's an

22   inherent confirmation bias or at least fiscal bias in a case

23   like this for Park Nicollet to pursue a prosecution without

24   any cost, and that's troublesome, and that is what we

25   believe is occurring here.

1          THE COURT:  Hang on one second, Mr. Engh.  Before

2   you leave the podium, I want to make sure I don't have any

3   other questions.

4          So as far as the bill of particulars, all you

5   really want is for them to identify the property or the

6   money.  If that's the case, why isn't the assertion that

7   they bilked HealthPartners out of $505,000 -- why isn't that

8   a sufficient disclosure of that?

9          MR. ENGH:  Well, it doesn't prove his motive,

10  which is always relevant.  I mean, he's approving a fellow's

11  pay and gets nothing back.  I want to know if he got

12  anything back.  That would be proof of it.  That would be

13  proof of a major crime, but the fact that he gets nothing

14  back is puzzling to me.  In every other fraud case --

15          THE COURT:  Got it.

16          MR. ENGH:  -- the defendant gets something.  They

17  are claiming a great embezzlement where he doesn't embezzle

18  anything.

19          THE COURT:  Your argument on the bill of

20  particulars is specific and exclusive to Mr. Koch?

21          MR. ENGH:  Correct.

22          THE COURT:  Got it.  Okay.  Thank you.

23          Ms. Jones.  Let me actually start with a question

24  to you that I probably should have asked Mr. Engh, but I am

25  assuming this argument that you're standing in the shoes of

1    HealthPartners is a figurative statement.  There is not some

2    legal way in which you have somehow -- the government has

3    somehow stood into the shoes of the victim company.

4              MS. JONES:  To say the least, Your Honor.

5              THE COURT:  Okay.

6              MS. JONES:  The government disagrees with that

7    statement, and its view is our job is to prosecute a crime

8    that's been committed, and these defendants engaged in a

9    crime.  The government's not standing in the shoes of Park

10   Nicollet.  It's prosecuting two defendants who committed a

11   crime, who misrepresented the work that was performed by one

12   of them, acted in concert in executing a scheme for the

13   purpose of receiving -- for the purpose of Mr. Kangas, in

14   particular, receiving pay for work he did not perform.  And

15   but for Mr. Koch's execution of that by entering falsified

16   work hours into Park Nicollet's time entry system on

17   Mr. Kangas' behalf, Mr. Kangas would not have received that

18   pay.

19            The court is correct in some of the questions with

20   Mr. Engh regarding what the government's position is with

21   respect to various items of discovery.  As the government

22   has articulated, we disclosed over 8,000 pages of discovery

23   in this case.  And to the extent that we have discovery that

24   we believe is discoverable, we have turned that over to the

25   defense and we will continue to do so; and we will continue

1    to ensure that to the extent we have something and they're

2    entitled to it, they will get it.  I just want to make that

3    clear.

4              So, for example, Mr. Engh mentioned Mr. Kangas'

5    evaluations for 2013 and 2014.  We'll go back through our

6    records to see if we can locate those.  Obviously, if we

7    have them, we will disclose them.  But to the court's point,

8    we can't disclose what we do not have.

9              THE COURT:  Yeah, here's -- here's the question in

10   my mind.  First of all, I'm not -- maybe you are getting to

11   it, but I'm not hearing you say that information is just

12   none of your damn business, defendants, you know.  Honestly,

13   it seems pretty relevant to me, pretty important evidence.

14   You're saying I don't have a dog in that fight, I don't have

15   it, sort of bottom line, right?

16             MS. JONES:  Yes, Your Honor.  And I would just

17   like to add the government did have the three evaluations,

18   2015, 2016 and 2017, and we turned those over.

19             THE COURT:  Right.  I have no doubt that anything

20   the government has, with the possible exception of *Jencks*

21   material, has not been turned over -- has been turned over.

22             MS. JONES:  Correct.

23             THE COURT:  I think the frustration that the

24   defendants have, in part, is you have, as a practical

25   matter, unfettered and cooperative access to the victim

1    company.  So if you need something or want to know

2    something, you guys pick up the phone and you either get the

3    documents or you get the information.  And not stated by

4    Mr. Engh, but sort of underlying all of this, I think is the

5    unstated concern, you know it's there, you know what you are

6    going to want and, lo and behold, you may have even gone and

7    seen it, looked at it, and two weeks before trial you're

8    going to say, hey, I'll take those documents now, and then

9    you're going to dump them on the defendants, and they're

10   going to be prejudiced.  That I think is sort of the

11   underlying concern here.  And I think what you're saying is,

12   I don't know if we're going to do that or not, but it

13   doesn't matter, we're not doing anything we can't do; and if

14   they want information, go get it.

15             MS. JONES:  To the extent -- I'm sorry to

16   interrupt, Your Honor.

17             THE COURT:  No.  Go ahead.

18             MS. JONES:  To the extent we don't somehow obtain

19   it, have it, and turn it over to them.

20             THE COURT:  Right.

21             MS. JONES:  But, I mean, it should not be lost in

22   this discussion that the government takes its *Brady*

23   obligation seriously.  And so -- and I certainly understand

24   why he's asking for those things, which is why we culled

25   through to see if we had them and just inadvertently didn't

1          produce them, but we can't produce what we don't have.

2                  And while you could say that the government has

3          unfettered access, I'm not sure that that's exactly true

4          either.  We're not trying to surprise the defense with

5          anything or hide anything from the defense in this regard.

6          We're simply giving them what we have that we believe that

7          they're entitled to.

8                  The concern with the defense saying, well, judge,

9          they can get this and this and this and this is the defense

10         is now directing the government as to going off and doing

11         its discovery and investigation for it.  And the rules do

12         not -- they are not structured for that, nor do they require

13         that.  And so the government's simply asking that it be held

14         to the requirements under the rules.

15                 THE COURT:  So if -- let's assume I agree with you

16         that you're -- you're not the defendants' investigator as it

17         were.  Do you have a view on -- you know, the other avenue

18         here is what Mr. Engh is suggesting, which is I can issue an

19         order to the victim company to turn over information.  We'd

20         see how that would play out.  But do you -- are you taking a

21         position?  Do you want to take a position of whether I have

22         the authority to do that?

23                 MS. JONES:  I mean, provided that the prerequisite

24         sort of standard is met, I think it's true that the court

25         might have that authority.  You know, I'd rather not take a

1      position at the moment.

2                 THE COURT:  Understood.  That's fine.

3                 MS. JONES:  But I just didn't want it to be lost

4      that I -- I understand where the defense is coming from.

5      The government has disclosed, as the court assumed, what is

6      in its possession and will continue to do so, but

7      significantly opposes the defendant being in the position of

8      directing the government to investigate in the way that the

9      defense deems appropriate.

10                THE COURT:  Okay.  Understood.

11                MS. JONES:  With respect to the loss amount, the

12     government's position in this case is that the defendant

13     didn't do the work that he claimed he did.  And while 10

14     patients or 20 patients or 30 patients, whatever the number

15     is, might come in and say, well, he did X for me, that

16     doesn't prove that, with respect to the whatever number of

17     hours remain, that he didn't work during that period of

18     time.  There's still a problem, that he's billed for time

19     that he did not perform.  And the defense has the evidence

20     in its possession showing that there's no entry of patient

21     information in the patient logging system that

22     HealthPartners or Park Nicollet maintains by Kangas during

23     substantial periods of time.

24                So Park Nicollet has a program.  It's referred to

25     as HDMS.  I can't remember what that stands for at the

1    moment, but it is Park Nicollet's program for entry of

2    patient-related data when a CPAP clinician interacts with a

3    patient.  There are two other similar-type databases.  One

4    is called AirView; the other is called U-Sleep.  And each of

5    those databases might generate a notification to a CPAP

6    clinician, for example, that a patient is having difficulty

7    with their machine, they are experiencing some delay of

8    leakage, that sort of thing.  So the CPAP clinician gets

9    that information from those programs and initiates contact

10   with the patient to say let's see if we can resolve whatever

11   this issue is.  And then when the person interacts with the

12   patient, one of the things they go back and do is they put

13   in patient notes into HDMS.  So that's how the patient

14   information moves from the clinician back to the

15   institution, so the institution knows what the clinician is

16   doing.

17              THE COURT:  Let me interrupt you for a second.

18   Correct me if I'm hearing this wrong, but what I'm hearing

19   you say is that in this HDMS --

20              MS. JONES:  Correct.

21              THE COURT:  I hate these masks.

22              MS. JONES:  It's hard.

23              THE COURT:  -- in the HDMS system Mr. Kangas or

24   Mr. Koch, whoever is entering the data, would, in a perfect

25   world, he would say, At this date on this date at this time

1    I performed this service for this patient.  And what I'm

2    hearing the government say is our proof of the fraud is that

3    in the HDMS database what we have is, On this date at this

4    time I performed this amount of time in service within the

5    scope of my employment, but doesn't name a patient.

6          MS. JONES:  No, that's not what the government is

7    saying.

8          THE COURT:  Okay.

9          MS. JONES:  What is clear is that Mr. Kangas did

10   not include any patient interaction information in HDMS for

11   substantial periods of time --

12         THE COURT:  But --

13         MS. JONES:  -- during which he was paid.

14         THE COURT:  Right, but what they're saying is, So

15   what; that doesn't mean he didn't actually do the work;

16   okay, he's really lousy at billing and really lousy at

17   recordkeeping, but he didn't -- he performed the service.

18   And you are saying, No, no, no; this is evidence that he

19   didn't.

20         MS. JONES:  That's some evidence that he didn't.

21         THE COURT:  Okay.

22         MS. JONES:  It's not the only evidence that he

23   didn't.

24         THE COURT:  Right.

25         MS. JONES:  Yes.

1      THE COURT:  So I'm kind of back to my question

2  that Mr. Engh didn't like for some reason, I don't think,

3  which is, Don't you have to -- when you come to the trial of

4  this case, do you not have to show you billed on this date

5  for this service and no service was rendered?  And

6  doesn't -- if the government can't say -- well, the

7  government's going to say no service was rendered.  But

8  doesn't he get to say, Sure, there was, but, okay, I suck at

9  recordkeeping, I don't know which patient it was.

10      MS. JONES:  I mean, he could say that.  He could.

11      THE COURT:  Okay.

12      MS. JONES:  But saying that you performed work,

13  but not in any way whatsoever recording that work consistent

14  with your employer's protocols, policies and procedures, I

15  mean, you could be performing magic too.

16      THE COURT:  Can you give me -- and maybe this

17  doesn't matter to this motion.  But can you give me any

18  sense of what information is entered in the HDMS system that

19  relates to where you say the services weren't performed?  In

20  other words, what was there?

21      MS. JONES:  In terms of the universe of

22  information?

23      THE COURT:  Yeah.  If we just assume, you know,

24  that on a particular date at a particular time Mr. Kangas

25  claims he performed an hour of work, but the HDMS system

1    doesn't contain at least everything that the employer would

2    require for that date and time, what does it contain or does

3    that vary a lot?

4            MS. JONES:  It does vary a lot.

5            THE COURT:  Okay.

6            MS. JONES:  It's patient specific, but it's

7    patient information.  It's the nature of issues that a

8    patient is having with a CPAP machine.  It's the method or

9    manner of addressing that that the CPAP clinician employs in

10   the hopes of resolving whatever the issue is.  It's any sort

11   of follow-up that might be necessitated or indicated from

12   their interaction, among other things.

13           THE COURT:  And the fraudulent entries -- I'm just

14   going to call them that, so we're talking on the same

15   page -- what information do the fraudulent entries contain?

16           MS. JONES:  The fraudulent entries, there is no

17   information where the fraudulent entries are concerned.

18   It's because he didn't do the work.

19           THE COURT:  Well --

20           MS. JONES:  He's not lying on the -- in terms of

21   the information that he's inputting.

22           THE COURT:  Right.  No.  What I'm trying to get

23   at -- correct me if I'm not following.  Okay?  But at least

24   what I've understood from the two of you is in order to get

25   paid --

1          MS. JONES:  Oh, I'm sorry.

2          THE COURT:  -- they got to put in this

3     information.

4          MS. JONES:  Got it.

5          THE COURT:  And it generates pay for these

6     services.

7          MS. JONES:  Okay.

8          THE COURT:  And the fraudulent entries that

9     generated pay, there's got to be at least something there in

10    order to generate the pay.  So what's there?

11         MS. JONES:  I'm sorry.  I was talking about HDMS,

12    and you were talking about the time entry system.

13         THE COURT:  Okay.  I didn't realize that.  Thank

14    you.

15         MS. JONES:  Okay.  What Mr. Koch then did was,

16    independently of the patient work or absence of work,

17    Mr. Koch entered into Park Nicollet's time entry system

18    certain numbers of hours that Mr. Kangas allegedly worked

19    that Mr. Kangas did not work and Mr. Koch was well aware

20    that Mr. Kangas did not work.

21         THE COURT:  And at least one part of the evidence

22    of that is we have the time entry system saying X and the

23    HDMS system just not reflecting that at all?

24         MS. JONES:  It could be the HDMS system.  It could

25    be other records from Park Nicollet that do not gel with a

1    12-hour day that was entered for Mr. Kangas on a particular

2    day.

3              THE COURT:  Okay.  All right.  I'm with you.

4              MS. JONES:  Okay.  With respect to the other

5    motions, there are various things that I could talk about,

6    Your Honor, that are sort of specific.

7              Obviously, to the extent that there is *Jencks*,

8    we'll turn over grand jury transcripts, things of that

9    nature.

10             We just don't think that for all the reasons I put

11   in my response that the court needs to conduct an in-camera

12   review.

13             And, Your Honor, the government believes that the

14   defense is asking for a bill of particulars precisely for

15   the reason that a bill of particulars is not permitted, and

16   that's as a discovery device.

17             THE COURT:  Well, let me ask you on that one.

18   They're asking -- they're saying, okay, you got to tell us

19   what Mr. Koch received here.  It's not in the indictment.

20   It's not in the records turned over.  So we need to know

21   what your assertion is about what he received.  That's what

22   I understand their argument to be.

23             MS. JONES:  As do I.

24             THE COURT:  So if that's -- if he's right that

25   that's not anywhere, are they entitled to the information?

1    It seems to me they are, but tell me if they are not.  And

2    if they are, how do they get it if it's not in discovery?

3              MS. JONES:  What the government -- the elements of

4    mail fraud are the existence of a scheme to defraud, you

5    know, in order to gain money or property.  I can't think of

6    all the others now, but that's the gist of the one that I

7    want to focus on.

8              THE COURT:  Right.  And it's the gaining of the

9    money or property that they're asking.

10             MS. JONES:  And the money or property is half a

11   million dollars paid to Mr. Kangas.  Not every member of

12   a -- not every member of a fraud scheme necessarily gets

13   some kickback related to that fraud scheme.  There are all

14   sorts of motivations, things that motivate people to engage

15   in fraudulent behavior, and the law does not require that.

16   The government is not required to prove that.

17             THE COURT:  So another way of saying that is

18   Mr. Koch aided and abetted Mr. Kangas actually getting the

19   money; we're not sure why he did it or it doesn't matter why

20   he did it, he did it, and it doesn't matter whether he got

21   any money himself.

22             MS. JONES:  That's one formulation.  In this

23   instance but for Mr. Koch, Mr. Kangas could not have gotten

24   the money.

25             THE COURT:  Because Mr. Kangas can't enter the pay

1    information into the time entry system.

2              MS. JONES:  Well, he could have, but Mr. Koch was

3    his supervisor, so he approved all of those time entries.

4              THE COURT:  Okay.  Okay.

5              MS. JONES:  And unless the court would like me to

6    address something else specific, I'll rest on my pleadings.

7              THE COURT:  Okay.  Very well.  I don't think I

8    have any other questions of you.

9              MS. JONES:  Okay.

10             THE COURT:  Okay.  Do you wish to have a brief

11   rebuttal, Mr. Engh?

12             MR. ENGH:  A couple of points.

13             The government may have given us 8,000 documents,

14   that's true, but in our review of it maybe 20 to 50 matter.

15   And this is -- this is the new protocol in the justice

16   department.  We get millions of documents, and what you are

17   looking for is a proverbial needle in the haystack; and what

18   I'm looking for is what he got out of it, for example, or

19   the treatment of patients, for example.  So the confusion

20   here is I give you 8,000 pages that really is meaningless to

21   us.  That's why we have discovery motions.

22             In terms of the, you know, the services rendered

23   by Mr. Kangas, these were not in turn billed to Medicare.

24   This was a service.  This was a flat service given to the

25   customers of Park Nicollet.  So it wasn't -- he got paid for

1    it, he didn't have to pay someone else, he didn't seek

2    compensation, which may explain some of the records, but we

3    have an explanation for the records at trial, which we will

4    not disclose now.

5              And in terms of the bill of particulars, you know,

6    it does go to Mr. Kangas' intent that he didn't get anything

7    out of this.  And it's really a simple question.  I mean,

8    say that he didn't get anything out of it.  Yes or no.

9    That's all they have to do.  And they refuse to do it for

10   some reason, and I don't understand why.

11             THE COURT:  Okay.  All right.  So, Mr. Engh, I do

12   want you to file some further written argument on these

13   points.  Okay?  How much time do you need?

14             MR. ENGH:  At least two weeks would be helpful.

15             THE COURT:  Okay.

16             MR. ENGH:  We don't have a trial date set, and I

17   think we are behind anyway on trials, so --

18             THE COURT:  I think we are.

19             MR. ENGH:  Yeah.

20             THE COURT:  Right.  I do want you to specifically

21   address in your written submission, you know, what authority

22   I have to order material directly from the victim company.

23   Okay?

24             MR. ENGH:  Okay.

25             THE COURT:  And anything else you think that we've

1    discussed today that will be helpful to me, please do.

2    Today is the 6th.  Let's say the 21st for your submission.

3    Okay?

4              MR. ENGH:  Great.  Thank you.

5              THE COURT:  Okay.  Thank you.

6              Ms. Jones, how much time do you need to respond to

7    Mr. Engh's submission, assuming you want to?

8              MS. JONES:  I assume I will want to and I'd ask

9    for 10 to 14 days.

10             THE COURT:  All right.  So May 21 for the

11   defendants' submission.  Two weeks from that will be I think

12   approximately June 4th.

13             MS. JONES:  Okay.

14             THE COURT:  So whatever that Friday is, your brief

15   would be due.  Okay?

16             MS. JONES:  Okay.  Okay.  Thank you, Your Honor.

17             THE COURT:  Okay.  Thank you.

18             So is there anything further today for the

19   government?

20             MS. JONES:  No, Your Honor.

21             THE COURT:  Okay.  Thank you.

22             Anything further today for the defendants,

23   Mr. Engh?

24             MR. ENGH:  Not for Mr. Koch, no.

25             THE COURT:  Okay.  Mr. Friedberg or Pacyga?

1              MR. PACYGA:  Yes.  Thank you, Your Honor.

2              THE COURT:  Okay.  Go ahead.

3              MR. PACYGA:  Good morning, Your Honor.  Ryan

4      Pacyga for Mr. Kangas.

5              First, the defense has basically joined and

6      mirrored the motions that Mr. Engh had filed on behalf of

7      Mr. Koch, but for the bill of particulars.  We are not

8      asking for that.

9              THE COURT:  Right.

10             MR. PACYGA:  And the flavor of this case is really

11     sort of a civil litigation case.  We're dealing with

12     acronyms and names of systems, for example.  Who is going to

13     be familiar with those?  Well, the defendants to a degree.

14     How these systems operate?  They may have limited knowledge.

15     Who is going to know that?  Park Nicollet.  Who else is

16     going to know that?  The government by virtue of its working

17     with Park Nicollet and their lawyers.  The government is in

18     the best position to obtain this information.

19             And the frustrating thing in cases like this is

20     that -- and I'm not accusing Ms. Jones of this, but it's

21     certainly possible for the government in this competitive

22     environment we are in, for example, which is the same reason

23     that search warrants require a neutral and detached

24     magistrate, the reason is the case law says that law

25     enforcement is a competitive environment and to ferret out

1   or to screen off and protect from that we want a neutral and

2   detached magistrate.  If we get into this situation with

3   Park Nicollet, their lawyers aren't going to want to give up

4   some of this information.  And the government, of course,

5   may have a different view of indeed what is *Brady*

6   information.  It's certainly -- we all can think of examples

7   where the defense thinks something is *Brady* information or

8   relevant, if you will, that the government will take the

9   position that it's not.

10            And the court hit the nail right on the head when

11   you discussed potentially that problem of, Is it *Jencks* or

12   is it *Brady*.  I think the problem is two levels.  You

13   identified one level of it.  Right?  And the problem is, Can

14   the government characterize it as *Jencks* and give a late

15   disclosure on it and sort of hold their cards that way, and

16   what would that do to the defendants' right to due process

17   and fair trial?

18            The second issue is not only how they -- how they

19   want to characterize it, okay, but, frankly, perhaps even a

20   mistaken view, because sometimes in the worst-case scenario

21   the government can get creative and articulate a reason why

22   something is *Jencks* and not *Brady* and argue it that way.

23   But the other problem is, is that, of course, we're dealing

24   with human beings.  All right.  And they look at things, the

25   government looks at things from a difference lens.

1    Sometimes this isn't even intentional.  But under even their

2    good faith efforts, they might look at evidence and say this

3    is *Jencks*, this is not *Brady*, or it's not relevant, even

4    under their best intentions, if they look at it from a *Brady*

5    lens.  But you can see why, for example, in motion hearings

6    and in suppression hearings, if you will, sometimes the

7    court can list a number of factors why there might be other

8    reasonable inferences for things that could favor the

9    defense.  So even under the best of intentions.  And then

10   what do we get to?  What do we get to if the government

11   looks at some of this information under the good faith

12   efforts of a *Brady* lens instead of a *Jencks* lens for a

13   minute and they say, well, we just -- we don't think that's

14   discoverable.  I would submit to you that I doubt Park

15   Nicollet's lawyers are going to look at it with that lens.

16   They are going to look at in protecting the financial

17   interests of and perhaps the confidential interests of Park

18   Nicollet internally.

19          THE COURT:  So what's the solution to that?  At

20   least as you pose it, let's say the government is sitting on

21   a stack of, you know, witness statements that they have

22   reviewed and they say there's just no *Brady* information

23   here.  You say, well, I don't know if there is or there

24   isn't.  What's the solution?

25          MR. PACYGA:  Well, one, but unfortunately, and I

1    know the court -- I mean, we may be asking for more than the

2    court wants to bite off, but in-camera review is a good

3    vehicle for that.  That's a neutral and detached magistrate,

4    with the idea that, again, a different view might be helpful

5    even under the best of good faith intentions by the

6    government, number one.

7            And the earlier -- I mean, this case is going to

8    involve a lot of documents, probably a lot of witnesses,

9    foundational witnesses.  I mean, a jury is going to be

10   hearing about acronyms, about things we've been discussing

11   today.  HDMS.  What does that mean?  What's this billing

12   system?  I mean, you can imagine that it goes on and on.

13   And the more out-front we are of these issues, the cleaner a

14   trial is going to go.  We're going to have hiccups on

15   foundation, on witnesses, on squabbling over the

16   admissibility of documents at trial, you know, where we're

17   right up against a trial, and that's not in the best

18   interests of any party in a case like this.

19           So this is why I think it's also important for the

20   court to closely examine about whether it's proper for the

21   court to order the government to get -- to get this

22   information.  And if the government gets all of it, if you

23   will, about what we're asking for in our discovery requests,

24   and it has, for example, a question about, well, perhaps

25   this is or isn't, I, number one, I think it's best that they

1     error on the side of *Brady*, on a *Brady* analysis, because the

2     results -- I mean, we could be back at a new trial if they

3     don't, at best, frankly, for the government.  At worst, the

4     defendants are -- his indictment is dismissed.  So I want to

5     head those problems off at the pass and just have a candid

6     discussion about that with the court and how we're looking.

7     I think we're looking at this that way.

8              In addition, it's tempting because of this

9     competitive enterprise, if you will.  And, again, I'm not

10    saying Ms. Jones would do this, but the reality is as much

11    as the government has as *Brady* obligations lawyers get

12    invested in the cases they have.  And Park Nicollet's

13    lawyers are going to -- they're going to be there.  Park

14    Nicollet's lawyers I foresee will be the guides, if you

15    will, like if you go hire a guide to walk you through an

16    area.  Right?  They've got to orient you to it.  Ms. Jones

17    isn't going to know where to go exactly to get what they

18    need from Park Nicollet, if the court directs any of this.

19    They are going to have to rely on the people at Park

20    Nicollet to take them there.  And the temptation is, of

21    course, that let's not get some of these records in this

22    certain place.

23              For example, what I'd really like to see is these

24    budget meeting minutes.  I mean, we've got five years of

25    bills and time going into Park Nicollet, five years, where

1    they're paying Mr. Kangas.  Five years the government says,

2    well, he was submitting this -- these bills that Mr. Koch

3    was entering, and these call records from these clients,

4    these patients don't match up.  Are we to believe that a

5    company like Park Nicollet with how many accountants and

6    controllers and layers of managers and budgeting meetings

7    and that is just simply not going to be aware of this for

8    five years, when apparently the whole time they've had the

9    records to compare and contrast Mr. Kangas' time with the

10   call logs from these patients, and for five years they just

11   didn't see this?  Did these discussions come up at meetings

12   and budgeting with higher-level managers that wouldn't have

13   even been to the knowledge of Mr. Koch?  Were there internal

14   memoranda or emails between managers and accountants and

15   those sorts of things talking about these issues?  Wouldn't

16   that be relevant to the defense?  Wouldn't that be sort of a

17   waiver, if you will, if Park Nicollet was aware of these

18   things and said that's fine, we don't need him?  What if

19   there's an email, for example?  We don't know this.  And

20   that's the problem in the *Ritchie* or *Perry* cases in state

21   court, if you will, is, well, the defense, what do you want?

22   Well, the problem is we want something like this, but we

23   can't tell you exactly if it exists or if it's there because

24   we don't have it.  They would have it if it exists.  But

25   wouldn't it be relevant, and wouldn't it be exculpatory, and

44

1    wouldn't it be *Brady*?  For example, if there are internal

2    memoranda or emails or sometimes companies have IMs, instant

3    messages, some of them are preserved, some of them aren't.

4    Okay.  But maybe they're -- I mean, if I'm a manager of Park

5    Nicollet and I'm seeing -- for example, what if there was a

6    jump in pay from whoever had the position before Mr. Kangas,

7    right, and all of a sudden the pay goes way up?  Is somebody

8    not realizing that at Park Nicollet?  And if they are, we

9    know there's going to be a discussion about that, whether

10   it's a meeting memoranda, internal emails, discussions

11   between higher-level managers or accounting or what have

12   you.  That stuff has to be there.  And if it's not there,

13   the defense needs to know that as well.  Everybody needs to

14   know that in this case if we're going to get at the truth.

15   These are the sorts of things we need, and I don't trust

16   that Park Nicollet's lawyers are going to go get it for us.

17   And I don't think -- I think that the vehicle there is that

18   the government, frankly, be ordered to go get it and get to

19   these things.

20        I assume that the government wouldn't want to

21   prosecute its case the same way or continue forward if that

22   sort of evidence existed.  I assume the government would

23   have serious concerns if that evidence turned up.  I would

24   hope they would.  I don't know that they know that.  We

25   don't know that they've sought that or not.  We need to know

1      these things or we've got a big problem on our hands.  And

2      that's -- that's just something for -- that's an example of

3      why we need these things.  And I could come up with probably

4      30 different things I'd want on that, you know, but that

5      gives the court the flavor of why I have serious concerns

6      about these things.

7              And you can get in a situation where a party,

8      whether it's Park Nicollet or the government or Park

9      Nicollet deceiving the government even, if they want to

10     cover their own selves here, because they've got a hefty

11     restitution claim here, could say, well, let's put our head

12     in the sand; we'll look behind door number one and door

13     number two, but we don't want to go here; and, frankly, we

14     might not tell the government that it exists, we don't want

15     to -- if they're not going to ask us.  So we need to -- we

16     need to knock on all these doors, we need to turn over every

17     stone here, because if evidence of that flavor exists,

18     that's going to do a lot to turn the case for the

19     defendants, in my opinion.

20              THE COURT:  Well --

21              MR. PACYGA:  The court -- go ahead.

22              THE COURT:  If this were a civil case, these would

23     be -- probably shouldn't say it this way -- these would not

24     be difficult questions for me.  You know, the big issue for

25     me is, you know, to what extent can the government be made

1    to do what you are suggesting, right, be the agent, if you

2    will, for getting information from Park Nicollet and if

3    not -- or HealthPartners, whichever it is; and if the

4    government is not that agent, what authority do I have to

5    tell Park Nicollet turn it over?  You know, those are the

6    big issues in my world, you know.  I mean, I well appreciate

7    the issue you have, and, you know, my problem is, you know,

8    what gets done about it and how and what's -- what's my

9    authority to do it.

10           MR. PACYGA:  I understand that.  At a minimum we

11   have a record right here and now of the *Brady* concerns that

12   the defense may have.  And I would hope that the

13   government -- well, Mr. Engh will be briefing this issue,

14   and so we'll have to look at -- we'll be helping him, of

15   course.

16           THE COURT:  Right.

17           MR. PACYGA:  And that is a question that we're

18   going to have to answer, but at the same time there are

19   requirements, if you will, under the law, perhaps, but the

20   overarching concern regardless perhaps of what the discovery

21   rules ought to be in this courthouse and in this district

22   ought to be, you know, finding *Brady* evidence if it exists,

23   whether or not a requirement is there.  These are just

24   fundamental questions in this case.  The government has the

25   ability with or without a court order to go to Park Nicollet

1    and say, yeah, we need to take a look at these things.  And

2    I think it's -- I think we have generally a good flavor for

3    the United States Attorney's Office in this district where

4    oftentimes they'll undertake to do those things.  And I

5    would hope that the government hears us loud and clear right

6    now, because now we've got a record of what these concerns

7    are, and they are on notice.  They are on notice by what I'm

8    saying here now.

9         So the other question, for example, along that

10   flavor is the government saying, well, there's patients'

11   information where they're calling into the company at times.

12   Sometimes they'd be calling Mr. Kangas' phone.  I don't know

13   if Park Nicollet even had a record of that happening or not.

14   But to the extent, for example, that these patients are

15   calling Park Nicollet and saying I've got a problem with my

16   CPAP machine, all right, and then they're saying there's no

17   record of a follow-up from Kangas, well, are there records

18   of follow-ups from these patients again?  Why don't we have

19   those records?  Because what's the inference if the patient

20   doesn't call back the next day?  One inference is that

21   Mr. Kangas helped them.  So why don't we -- we should

22   probably have those records and the records of those

23   patients so we can follow up on them.

24        THE COURT:  Where do those records exist?  Are

25   those -- is it your --

1           MR. PACYGA:  Park Nicollet is what the government

2    was saying -- for example, they said if he helps 10, 20, 30

3    patients, then they know that some of these calls are coming

4    in, you know.  I don't know if there are records if they

5    called directly to Mr. Kangas, but --

6           THE COURT:  My question was a little different.

7           MR. PACYGA:  I'm sorry.

8           THE COURT:  Are those, in your understanding, are

9    those in patient charts?  Or is there some other place where

10   that -- if a patient calls and says my CPAP machine is not

11   working, where does that get logged or charted as it were?

12          MR. PACYGA:  Well, and that's part of the problem,

13   is I don't think we know.  I mean, our clients can tell us

14   some things, but, again, they're one small part of the

15   operation, and even the CPAP operation is bigger than these

16   two guys.  They had a very distinct role, if you will.  So

17   this is another reason why we get back to the discovery

18   issues that we have.  That's a good question.  We want to

19   know that too.  You know who knows?  Park Nicollet.  You

20   know who can get it?  The government.  That's where we are

21   at and that's why we have these concerns, respectfully.

22   But, I mean, I wanted to drive that point home because these

23   things are important in this case.  And it's not very fair,

24   if you will, it feels like, if the government or Park

25   Nicollet's lawyers say again, well, we want to go -- we are

1    going to give you these things, right, here's what it is.

2    There may very well be some other things here that we don't

3    want to give up, but we're just not going to open that door,

4    we're not going to go there, we're going to put our head in

5    the sand about that, but that's not fair.  That's where

6    we're at.  And let's get real about what's going to happen

7    if we have to subpoena Park Nicollet financially for these

8    two?  That becomes a very unfair fight.  And this is -- I

9    think there's *Brady* things in there.  And I don't know that

10   these two people should have to spend who knows how much

11   kind of money fighting Park Nicollet and their lawyers and

12   dragging out this litigation.  There may very well be *Brady*

13   information in there, and everybody is on notice right now

14   that that might be there, and I think the right way to do it

15   is just to go get it now.  Why would we even want to

16   entertain those kind of problems later?  Why would the

17   government want to proceed with the case if they don't know

18   this information?  I'm hearing that they've given us what

19   they have.  So I don't think -- if that's true, I don't

20   think they know this either.  And that shouldn't be

21   happening in this courtroom.

22            Thank you.

23            THE COURT:  Thank you, Mr. Pacyga.

24            Ms. Jones.

25            MS. JONES:  Your Honor, as I said before, the

1    government takes its *Brady* obligations very seriously.  And

2    the suggestion that there's a *Brady* issue I'd like to

3    address, because there's no specific *Brady* issue before the

4    court today.  There are all sorts of hypotheticals that have

5    been lobbed at the court that could potentially raise *Brady*

6    issues, but there's no *Brady* issue that's been brought to

7    the court.  And I want the record clear about that so that

8    there's no ambiguity.

9            In addition to that, when it comes to this

10   balancing, is it *Jencks,* is it *Brady*, the government's view

11   with respect to that is it is not in our interests or any

12   case that we prosecute to error on the wrong side of that.

13   It is always in our interest to, out of an abundance of

14   caution, assume that it might be construed as *Brady* and

15   disclose, because there's no harm making that decision as

16   opposed to the opposite decision.  And that is -- that is

17   the path the government always takes, at least I do, and

18   that's the path this prosecution has taken and will take

19   leading up to the trial.

20           There are lots of things that Mr. Pacyga said

21   about, for example, budget meetings, what if there are --

22   you know, what happened at these budget meetings and Park

23   Nicollet didn't know that.  At the end of the day frauds

24   continue because people don't know that somebody is lying to

25   them.  And that's what happened here.  There might be budget

1    meetings.  There might be budget meetings talking about

2    numbers.  That doesn't address whether someone lied about

3    whether they were performing the work for which they got

4    paid.  So, sure, there could be budget meetings.  There

5    probably were budget meetings.  That doesn't mean that the

6    salary of a part-time CPAP clinician of an institution such

7    as Park Nicollet/HealthPartners would ever be discussed.

8    Frankly, I wouldn't expect it to be discussed.  I certainly

9    wouldn't expect it on a particular clinician who is a

10   part-time clinician to be discussed at a large budget

11   meeting.  That would be unusual for an institution of that

12   size.

13            Again, unless the court has specific questions,

14   I'll rest on my written response to the motion or motions,

15   and I will respond once the defense files their --

16            THE COURT:  You'll respond in kind, right?

17            MS. JONES:  Yes.

18            THE COURT:  All right.  I don't have questions.

19            I guess, you know, I'll leave you both with this

20   comment or observation.  On the *Brady* issue, the big legal

21   question in my mind is, Are these materials that have not

22   been reviewed presently in the possession of the government.

23   That strikes me as the legal issue.  Right?  So I guess I'll

24   be further enlightened on that.

25            All right.  These motions are submitted.

1          I hesitate to ask, but anything further now?

2          MS. JONES:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Let me ask you one thing.

4     What is the trial date in this case?

5          MS. JONES:  It has not been set --

6          THE COURT:  It has not been set.

7          MS. JONES:  -- because of the master calendar, I

8     assume.  And so they'll get to us once they get the folks

9     who are in custody --

10          THE COURT:  Do you have visibility to the master

11     calendar such that you know whether you are on it?

12          MS. JONES:  I know -- I know to date we are not on

13     it.  Well, I can't say I know that.  Here's what I'll say.

14     No trial date has been scheduled.  I don't have any

15     visibility about whether that's -- we're on it somewhere.

16     We just have not been notified of a date.

17          THE COURT:  Okay.

18          MR. PACYGA:  I just was going to offer, if I may,

19     Your Honor, that to the extent we get down this road with

20     the discovery and there's more discovery on some of these

21     things we are asking for, the defense -- we would be

22     agreeing to a protective order, of course, for those

23     matters.  They probably have internal ops information at

24     Park Nicollet and certainly patient information and that.

25     For what it's worth.

1              THE COURT:  Okay.  Thank you, Ms. Jones.

2              All right.  Anything further for either of the

3     defendants?

4              MR. ENGH:  No, Your Honor.  Thank you.

5              MR. PACYGA:  No.  Thank you, Your Honor.

6              THE COURT:  All right.  Well, so we're off the

7     record.  Then those motions are submitted.

8              (Court adjourned at 10:24 a.m., 05-06-2021.)

9                              *   *   *

10             I, Renee A. Rogge, certify that the foregoing is a

11    correct transcript from the record of proceedings in the

12    above-entitled matter.

13                      Certified by:  /s/Renee A. Rogge_____

14                                     Renee A. Rogge, RMR-CRR

15

16

17

18

19

20

21

22

23

24

25