UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-291 (DSD/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. GREGORY CARL KOCH and
2. JEROME DAVID KANGAS,

Defendants.

**TRIAL BRIEF AND MOTIONS IN LIMINE OF THE UNITED STATES**

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Michelle E. Jones and Robert M. Lewis, Assistant United States Attorneys, submits its trial brief in this matter. This memorandum includes a summary of the facts the government expects the evidence to establish at trial along with briefing addressing the government's motions in limine and other potential evidentiary matters.

## BACKGROUND

Over a five-year period, defendants Gregory Carl Koch ("Koch") and Jerome David Kangas ("Kangas") defrauded their employer, Victim Company, out of more than $500,000. As the manager of Continuous Positive Airway Pressure ("CPAP") clinicians and Kangas's supervisor, Koch used his position to approve and enter hours into the Victim Company's time management system that he knew that Kangas, a "casual" CPAP clinician, did not work. Koch also allocated substantial overtime pay to Kangas to increase Kangas's wages during the scheme. For his part, Kangas received and cashed bi-monthly payroll checks from Victim Company despite knowing that he did not perform work

commensurate with the pay he received from Victim Company. Koch and Kangas also shared the proceeds of their fraud scheme. To conceal their sharing of fraud proceeds and the source of those funds, the defendants made various cash withdrawals from, and deposits into, their respective bank accounts. Kangas also structured cash transactions to evade the filing of currency transaction reports by his bank.

## I.   The Charges

The Superseding Indictment charges the defendants with five counts of aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 2 and 1341, and one count of conspiracy to commit mail fraud and currency structuring, in violation of 18 U.S.C. § 371. Jerome Kangas is charged with an additional count of currency structuring, in violation of 18 U.S.C. § 5324.

The five mail fraud counts allege that as part of the scheme to defraud, Koch and Kangas caused the Victim Company to issue payroll checks to Kangas by U.S. mail on certain days despite being aware that Kangas was being paid for work he did not perform. Specifically, Count One charges that on or about March 18, 2016, Koch and Kangas caused the victim company to send a payroll check in the amount of $2,254.96 to Kangas via the U.S. Postal Service. *Id*. ¶ 13. Count Two alleges that on or about November 25, 2016, Koch and Kangas caused Victim Company to send a payroll check in the amount of $2,254.96 to Kangas via the U.S. Postal Service. *Id*. Count Three charges that on or about September 1, 2017, Koch and Kangas caused Victim Company to send a payroll check in the amount of $1,849.61 to Kangas via the U.S. Postal Service. *Id*. Count Four charges that on or about February 16, 2018, Koch and Kangas caused the Victim Company to send

2

a payroll check in the amount of $2,453.44 to Kangas via the U.S. Postal Service. *Id*. Count Five charges that on or about April 27, 2018, Koch and Kangas caused the Victim Company to send a payroll check in the amount of $2,414.25 to Kangas via the U.S. Postal Service. *Id*.

Count Six charges the defendants with conspiring to commit mail fraud and currency structuring in order to defraud the Victim Company by causing the company to pay Kangas for work that he did not perform and by sharing the proceeds of the fraud. *Id*. ¶¶ 15, 16. The manner and means of the conspiracy include:

(1)    Koch approved the payment of wages to Kangas despite knowing that Kangas was not performing work commensurate with the compensation paid to him;

(2)    Koch submitted annual performance reviews reflecting that Kangas was performing his work in a satisfactory manner despite Koch's awareness that Kangas was not performing work commensurate with the wages Kangas was paid;

(3)    Koch logged into the Victim Company's computer network periodically using Kangas's credentials to make it appear that Kangas was performing job duties for Victim Company;

(4)    Koch allocated and approved overtime pay to Kangas which allowed Kangas to receive increased payments from Victim Company;

(5)    Koch assisted Kangas in resetting his login credentials to avoid discovery of the scheme; and

(6)    Kangas shared proceeds of the scheme with Koch.

The indictment also sets forth numerous overt acts Koch and Kangas committed in furtherance of the conspiracy.  They include:

(a) Kangas deposited various checks into his Wells Fargo Bank account and made several cash withdrawals of roughly $5,000 on several dates between late-July 2017 and mid-August 2017 totaling $30,500;

(b) On August 14, 2017, four days after Kangas's last $5,000 cash withdrawal, Koch deposited $29,300 into his US Bank account then sent $26,000 to TD Ameritrade to open an investment account;

(c) On September 1, 2017, February 16, 2018 and April 27, 2018, Koch caused payroll checks to be mailed to Kangas by the Victim Company;

(d) On March 20, 2018, Koch prepared an annual performance review for Kangas;

(e) On June 6, 2018, Koch and Kangas communicated with an employee of Victim Company in order to restore Kangas's access the Victim Company's network; and

(f) On June 15, 2018 Koch signed and submitted a resignation letter to Victim Company on Kangas's behalf.

Finally, Count Seven of the Superseding Indictment charges Jerome Kangas with knowingly structuring currency transactions to evade the reporting requirements of 31 U.S.C. § 5313(a).  In conjunction with regulations located at 31 C.F.R. § 1010 *et seq.*, Section 5313(a) requires domestic financial institutions to report currency transactions in excess of $10,000 and record certain information relating to those transactions, including the name and address of the individual presenting the transaction.  *See* 31 U.S.C. § 5313(a); 31 C.F.R. § 1010.310-314.   Specifically, Section 1010.314 proscribes structuring or

attempting to structure a transaction with a domestic financial institution in order to evade the filing of a currency transaction report ("CTR") as required by § 5313(a). The Superseding Indictment alleges that on July 28, August 1, and August 5, 2017 Kangas made cash withdrawals in the amount of $5,000 from his account at Wells Fargo Bank. Superseding Indictment ¶ 21. On both August 1 and August 7, 2017, Kangas received an additional $5,000 in cash after depositing checks on those dates. *Id*. Finally, on August 10, 2017, Kangas withdrew $5,500 from his Wells Fargo Bank account. *Id*. Count Seven alleges that Kangas made each of these transactions knowingly and for the purpose of causing Wells Fargo Bank to fail to file a CTR.

## II.     Elements of the Charged Offenses

### A.     Mail Fraud

Counts 1 through 5 charge the defendants with aiding and abetting mail fraud in violation of 18 U.S.C. § 1341. The crime of mail fraud has three elements, which are:

One, the defendant voluntarily and intentionally devised or participated in a scheme and artifice to defraud or to obtain money, property or property rights by means of material false representations or promises;

Two, the defendant did so with the intent to defraud; and

Three, the defendant used, or caused to be used, the mail in furtherance of, or in an attempt to carry out, some essential step in the scheme.

### B.      Conspiracy

Count 6 charges the defendants with conspiracy to commit mail fraud and currency structuring.  The crime of conspiracy to commit mail fraud or currency structuring has four essential elements:

One, the defendants reached an agreement to commit the crime of mail fraud or currency structuring;

Two, the defendant voluntarily and intentionally joined in the agreement, either at the time it was first reached or at some later time while it was still in effect;

Three, at the time the defendant joined in the agreement, the defendant knew the purpose of the agreement; and

Four, while the agreement was in effect, a defendant knowingly did one or more acts for the purpose of carrying out or carrying forward the agreement.

### C.      Currency Structuring

Count 7 charges defendant Jerome Kangas with structuring of currency transactions. The crime of currency transaction structuring has three essential elements:

One, the defendant knowingly conducted a currency transaction that involved a domestic financial institution;

Two, the defendant knew of the financial institution's obligation to report currency transactions in excess of $10,000; and

Three, the purpose of the structured transaction was to evade that reporting obligation.

### III.    Summary of the Evidence to Be Presented at Trial

Greg Koch used his role as a supervisor in the CPAP department to assist Jerome Kangas in getting hired as a respiratory therapist by the Victim Company.  In May 2011, Greg Koch was hired by Victim Company to work as a full-time Respiratory Therapist in the Meadowbrook store located in St. Louis Park, Minnesota.  His position title was CPAP Clinician.  At the time that he was hired by the Victim Company, Koch provided Kangas as an employment reference; the two had worked together at a previous employer.  CPAP clinicians generally assist patients who have been diagnosed by a physician with sleep disordered breathing and prescribed a CPAP machine.  The CPAP clinicians help patients obtain a properly-fitting mask and educate them about how to use their CPAP machine.  They also engage in follow-up communications and later troubleshooting of any issues patients experience with the use of the machine.  The Victim Company's CPAP clinicians performed their jobs primarily at sleep clinics or retail "sleep stores" in the metro area.  While they do not perform work in patients' homes, they may work with patients in a hospital setting.

In 2012, Koch was promoted to be the CPAP clinic supervisor.  The Victim Company operated retail CPAP sleep stores in St. Louis Park, Maple Grove and Shakopee at that time.  As the supervisor, Koch oversaw the operation and staffing of the sleep stores.  In 2015,  Koch's ascent at the company continued when he was promoted to manager of retail operations related to CPAP-related durable medical equipment.  In this capacity, he was responsible for the hiring of all sleep store personnel, including CPAP clinicians and product specialists, as well as oversight of all of the Victim Company's retail sleep stores.

In approximately May 2013, Koch was given authority to hire a "casual" CPAP clinician. Casual CPAP clinicians generally work on an on-call or part-time basis. Jerome Kangas was hired as a casual CPAP clinician by the Victim Company in June 2013 to be supervised by Koch. Kangas was hired to work on an on-call basis out of the Meadowbrook CPAP sleep store, which was also Koch's regular duty station. While employed as a CPAP Clinician by the Victim Company, Kangas was responsible for educating patients about the use of their CPAP machines and assisting them with addressing any problems that arose with the machines. As health care professionals, CPAP clinicians were expected to chart or record all interactions with patients for future reference. While Kangas was employed by the Victim Company, clinicians were required to document their interactions with patients in the Victim Company's Heath Data Management System ("HDMS"). HDMS was the database where patient notes and interactions were recorded. Charting in HDMS permitted other clinicians or employees who interacted with patients to learn of any issues a patient may have had as well as any efforts that had been undertaken to address such issues when a patient called a CPAP sleep store for assistance. Amongst the clinicians, the general perspective regarding documenting patient interactions was if they were not recorded, for all intents and purposes, they did not happen.

Other electronic databases that CPAP clinicians at the Victim Company accessed to do their work included AirView and U-Sleep. AirView is a "cloud"-based system that records data sent directly from a patient's CPAP machine and is often the first place a CPAP clinician would check if a patient called due to a problem with their machine. It

8

provides information on the patient's CPAP machine use and any issues that may exist with the machine. AirView feeds the data it collects from patients' CPAP machines into a program called U-Sleep, and U-Sleep uses that data to triage patients. It can tell CPAP clinicians to contact specific patients based on problems that may be occurring with a patient's CPAP machine, such as leakage or low pressure. U-Sleep also has the capability to notify patients regarding the function of their CPAP machines. Both of these programs assist CPAP clinicians in assessing and addressing issues experienced by Victim Company patients.

During the five years that he was employed by the Victim Company, Kangas was paid for over 38,000 regular, weekend, holiday, and overtime (including on-call or "pager pay") hours. "Pager pay" was compensation CPAP clinicians received for being available to handle any calls received from Victim Company patients after the normal business day concluded. It included additional pay if a CPAP clinician actually responded to calls while in possession of the pager or call phone used to field calls from patients after hours. Like other patient interaction, responses to patient after-hours calls was expected to be recorded in HDMS the next time the CPAP clinician reported to work at their sleep store.

During Kangas's employment with Victim Company, Koch approved and entered all of Kangas's work hours into the Victim Company's time management system called Kronos. Ordinarily, CPAP clinicians swiped their employee identification badge at a clock station upon arrival at their duty station and did the same upon departing for the day. However, upon commencing an investigation after Kangas's resignation, the Victim Company learned that there was no record of Kangas punching into a clock station (or

swiping his badge) at a Victim Company sleep store location during the five years that he was employed there.   Instead, Koch entered all of Kangas's hours into Kronos; thus, Kangas's pay was calculated based exclusively on Koch's time entries.

On June 18, 2018, Koch was terminated by the Victim Company in a routine reorganization, and the scheme quickly unraveled.   Within hours of learning that his position as Manager of the CPAP healthcare products was being eliminated, Koch signed and submitted a resignation letter for Kangas to the Victim Company.   Koch backdated the letter to June 15, 2018 so that Kangas's purported resignation appeared coincidental and unrelated to Koch's termination by the company.   Upon Koch's departure, the incoming manager of the CPAP clinicians was unable to determine who Kangas was and the extent to which he had actually been working as a casual CPAP clinician for the company.   After additional questions were raised regarding Kangas and his work on the company's behalf, the company initiated an investigation.   That investigation revealed that despite being paid more than half a million dollars by the company over five years – more than any other clinician and comparable to his supervisor Greg Koch – Jerome Kangas had not performed the work for which he had been hired and all of his time entries had been entered by Koch. Various business records of the Victim Company, including personnel files, performance appraisals,  work schedules, timecard records, payroll records, email and network access data will be offered as evidence during trial.

Other indicia that Kangas did not perform work commensurate with the wages he was paid include his failure to access HDMS, lack of ability to work remotely and failure to appear on CPAP clinician schedules.   Kangas only logged into HDMS, the Victim

Company's electronic database for charting patient data, approximately five times in the five years that he was employed by the company. By contrast, clinicians typically log into the system at least once a day. HDMS is the system that CPAP clinicians use daily to log patient interactions after assisting them with issues arising with their CPAP machines, which comprised the bulk of their job responsibilities. Further, Kangas was never issued a laptop by Victim Company, nor was he provided a digital token which would have been needed to perform his work remotely. Nevertheless, Koch regularly entered time for Kangas indicating that Kangas worked 8-to-12-hour daytime shifts at a sleep store location when, in fact, Kangas never did so.

Not only did Kangas fail to appear on clinician schedules created during the time he worked for the Victim Company, but other CPAP clinicians also supervised by Koch—and who worked in the sleep stores where clinicians assisted patients—never met Kangas and did not know who he was though some recalled seeing his name occasionally on CPAP clinician group emails. Some of these former employees will testify regarding their work as CPAP clinicians for the Victim Company and their lack of familiarity with Kangas. Some of them recall Koch trying to suggest to them that they knew who Jerome Kangas was when, in fact, they did not.

Koch extended and concealed the scheme by logging into the Victim Company's network using Kangas's login credentials on various occasions and completing documentation commending Kangas for his work with patients to make it appear that Kangas was performing the work for which he was paid. Although the Victim Company's network shows numerous logins using Kangas's login credentials in 2016, 2017 and 2018,

one of the computers on which many of those logins occurred was assigned to Koch and located at the Meadowbrook sleep store.  In addition, some of the login activity appears to show Koch logging off of a computer using his own credentials then logging back into the computer using Kangas's credentials to make it appear that Kangas was active on the network.  In one such instance, the login credentials of Koch and Kangas are used to access Victim Company's network from the same workstation within a minute of each other.  Not surprisingly, Kangas's username and password for the Victim Company's network were found in Koch's emails.  A review of Kangas's emails revealed hundreds of unopened emails and a conspicuous absence of any substantive emails about the work he purportedly performed for the Victim Company.  In his efforts to conceal and extend the fraud scheme, Koch also completed annual performance reviews of Kangas rating him a satisfactory employee and commending his work with patients when no such work was documented in the Victim Company's records by Kangas, a licensed respiratory therapist who was well aware of the importance of charting patient interactions for future reference and treatment purposes.

The defendant's efforts to conceal the scheme also included ensuring that Kangas's password remained active in the Victim Company's system.  To that end, on at least three occasions in 2017 and 2018, Kangas called the Victim Company's Support Center to have his password reset claiming to have forgotten it.  On one of these recordings, Koch can be heard appearing to suggest an excuse that Kangas should offer for why his password needed to be reset.  These recordings will be offered into evidence at trial.

Prior to Kangas being hired, on-call pay rotated among the clinicians in Koch's group. However, shortly after Koch hired Kangas, Koch began allocating all of the call pay hours to Kangas from 2014 through his resignation in 2018. The combination of call pay hours and regular hours paid to Kangas based on Koch's time entries on his behalf made Kangas the highest paid CPAP clinician in Koch's group for all but the first year he was employed by Victim Company despite his status as a casual clinician. Kangas was paid by Victim Company close to $100,000 per year save for the partial year 2013.

Prior to and during his employment with Victim Company, Kangas was employed full-time as a respiratory therapist for another employer, Select Medical Corporation/Regency Hospital. His work at Regency required his presence on premises working with patients during daytime business hours. Kangas was required to clock in and out at Regency daily even for lunch breaks. He was not permitted to perform work for other entities while on the clock at Regency. During the five years he was employed by Victim Company, Koch entered daytime work hours for Kangas at Victim Company on over 500 days while Kangas was actually on the clock at Regency Hospital. These dates include the dates set forth in Counts 1 through 5, the mail fraud counts in the Superseding Indictment. Kangas was also employed part-time as a respiratory therapist for Corner Home Medical while employed at Regency and Victim Company.

Kangas's income from Victim Company essentially doubled his earnings from his two other jobs. Kangas routinely converted a significant percentage of this income into cash during the scheme. From his hiring at Victim Company in June 2013 until the end of his employment five years later, Kangas withdrew more than $225,000 in cash and cashed

checks in hundreds of transactions, an average of almost eight withdrawals per month. While he also made some cash deposits, during the scheme the net cash out averaged more than $30,000 annually. Kangas's habit of dealing in significant amounts of cash facilitated two things: frequent gambling and the ability to share proceeds of the scheme with Koch.

Kangas's financial records also reveal frequent transactions at casinos and gaming enterprises, as well as online gambling. The evidence will show that he withdrew significant amounts of cash at Running Aces casino in Minnesota and casinos in Las Vegas, and he also engaged in thousands of dollars in internet gambling. Kangas's gambling rose to a level where it caused him to declare losses of almost $45,000 from 2017 to 2018.

Greg Koch's bank records reveal multiple instances where he deposited cash in close proximity to Kangas withdrawing sums from his own account. For example, early on in the scheme in August and September 2013, Kangas withdrew a total of almost $1,300; one day later, Koch deposited $350. A larger exchange occurred approximately a year later. Between July 29, 2014 and August 4, 2014, Kangas withdrew $6,602.50 in four transactions. The day after the last such withdrawal, Koch deposited exactly half of that amount[1] into his account: $3,300.

Aside from these transactions early on in the scheme, bank records suggest that the defendants mostly took care not to create records of their financial coordination. This is not inconsistent with the ongoing fraud, because cash by its nature makes tracing funds difficult. There was, however, one significant exception in August 2017.

---

[1] Setting aside the $2.50 transaction fee from the ATM withdrawal at a convenience store on July 29, 2014, the amount to be divided was $6,600 and Koch deposited $3,300.

On August 14, 2017, less than a year before the scheme ended with both men's departure from Victim Company, Koch deposited $29,300 in cash into his US Bank account and purchased a cashier's check for $26,000, which he sent to TD Ameritrade online brokerage to engage in day trading. Koch's financial records provide no explanation for the infusion of $29,300. His tax returns and bank records reflect no moonlighting or independent work – or other activity that might generate significant cash. Nor do they reflect significant gambling like Kangas's do. The $29,300 was more than four times the total of all cash deposits into Koch's account over the preceding four years.

Kangas's activity, on the other hand, does provide an explanation. In less than two weeks between July 28, 2017 and August 10, 2017, Kangas withdrew $30,500 from Wells Fargo Bank. The cash was divided into three separate cash withdrawals of $5,000, one $5,500 cash withdrawal, and the receipt of $5,000 cash back from two different deposits. Kangas went to five different Wells Fargo branches to obtain this cash, including one in Woodbury distant from both his home and work locations. On August 1, 2017, Kangas even went to two different branches on the same day to obtain $5,000 in cash each time. The last withdrawal was on August 10, 2017. Four days later, on August 14, 2017, Koch deposited the $29,300 in cash at US Bank.

On June 21, 2019, defendant Jerome Kangas spoke briefly with Special Agent Kurt Beulke while Kangas was sitting in his car outside Regency Hospital. During that interaction, Kangas described the nature of his work at Victim Company as on call only. He indicated that Koch would forward a list of patients for him (Kangas) to call, which he did. He recalled receiving 4 hours of pay for each call plus $4 per hour for being on call

15

while he worked for Victim Company. He also acknowledged being the highest paid clinician in the group, making nearly $100,000 a year, despite working only part-time. Finally, he admitted having Koch sign his resignation letter for him, though he claimed not to recall that he resigned on the same day that Koch was terminated by Victim Company. The government anticipates offering Kangas's statement at trial.

## IV.     Potential Legal and Evidentiary Issues

### A.      Admission of Certified Business Records

The government intends to offer employment and other business records collected during the Victim Company's investigation; employment records from Corner Home Medical and Regency Hospital/Select Medical Corporation; bank records from Wells Fargo Bank and US Bank; and investment account records from TD Ameritrade as certified business records under F.R.E. 902(11). Those records are maintained in the normal course of business and were provided in response to grand jury or trial subpoenas. Each record was either provided by a custodian of records with a declaration pursuant to Federal Rules of Evidence Rule 902(11) or a declaration is in the process of being obtained.

The underlying documents are business records that fall under the hearsay exception set forth in Federal Rule of Evidence 803(6). Federal Rule of Evidence 902(11) provides that certified domestic business records of regularly conducted activities are self-authenticating and therefore admissible under Federal Rule of Evidence 803(6) if accompanied by a written declaration from a records custodian or other qualified person certifying that the records:

a.      were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

b.      were kept in the course of a regularly conducted activity; and

c.      were made by the regularly conducted activity as a regular practice.

The Advisory Committee Notes to the 2000 Amendments make it clear that a declaration that satisfies 28 U.S.C. § 1746 would satisfy the declaration requirements of Federal Rule of Evidence 902(11).  The United States has provided defendants copies of the underlying certified business records will make any requested certifications available on request.

The United States submits that the certified business records satisfy the requirements of Rule 803(6) and Rule 902(11), and respectfully requests that the Court make a pretrial ruling on the admissibility of these records.  As such, there is no need for in-court testimony of records custodians. *See United States v. Watson*, 650 F.3d 1084, 1090 n.3 (8th Cir. 2011) (holding that there is no Confrontation Clause violation by admitting Rule 902 records without calling the custodian or other person qualified to certify the record).  Such a ruling would allow the United States to avoid the need to subpoena and call records custodians to testify about the maintenance of these records and would significantly streamline the trial.  Defense counsel would, of course, retain their right to make objections to specific documents based on hearsay, relevance, etc.

**B.      Stipulations and Self-Authentication Pursuant to Federal Rule of Evidence 902**

The government has proposed factual and foundational stipulations to streamline the trial and obviate the need to call witnesses on discrete issues clearly established by

other evidence. Defendants' counsel has informed the government that they will sign a foundational stipulation governing business records and self-authenticating documents. The government will request to put this stipulation on the record at the pretrial conference.

### 1.    Stipulations of Fact

The parties have agreed to enter into two stipulations of fact. The parties have discussed a stipulation of fact that the materials described as having been mailed as set forth in Counts 1 through 5 of the Superseding Indictment were in fact mailed pursuant to a regular business custom and practice. The second is a stipulation of fact that Wells Fargo Bank is a financial institution for purposes of the statutes applicable in this case. In light of these two stipulations, the government intends not to call a witness from Wells Fargo or the mailing department of the Victim Company to provide testimony to establish these facts. The government respectfully requests that the defendants' agreement to the stipulations be confirmed at the pretrial conference to ensure that additional witnesses do not need to be added to the witness list and arrangements made to procure their appearance for trial.

### 2.    Foundation Stipulations

The parties have agreed to foundational stipulations with respect to business records that will obviate the need to call custodians of records as witnesses at trial. The government will request to put this stipulation on the record at the pretrial conference.

### C.     The Government's Use of Defendant Kangas's Statement Is Not Hearsay

The government intends to introduce Jerome Kangas's statement regarding his employment at Victim Company to Special Agent Beulke.  This statement is an admission by a party opponent.  However, Kangas may not elicit evidence of his own prior statement.

An out-of-court statement made by an opposing party categorically is not hearsay. Fed. R. Evid. 801(d)(2).  Moreover, statements are not hearsay when introduced not for the truth of the matter asserted, but instead to show the effect on a listener's conduct or to establish knowledge on the part of the listener.  Fed. R. Evid. 801(c)(2) (prohibiting hearsay when offered to prove the truth of the matter asserted); *United States v. Roberts*, 676 F.2d 1185, 1187-88 (8th Cir. 1982).  But a defendant cannot elicit evidence of their own statements or those of their agents.  Fed. R. Evid. 801(d)(2); *United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008) (rejecting defendant's self-serving out-of-court statements as inadmissible either as statements against interest or under residual hearsay exception). Defendant Kangas's statement to Special Agent Beulke is admissible if offered into evidence by the government but remains hearsay if offered directly by the defendants.

### D.     Motion to Preclude Evidence of or Reference to Pretrial Discovery Issue

During the motions practice phase of this case, the defendants moved pursuant to Rule 16 for an order that required the government to request certain categories of information from the Victim Company.  (ECF No. 75).  The basis for the motion was the claim that the records of the Victim Company were within the government's "possession, custody, and control" based on the Victim Company having cooperated with the

government's investigation.  The Magistrate Judge issued the order, and this Court rejected the government's objections to the order.  (ECF No. 82).  The government complied with the order, asking the Victim to respond to the requests.  As the government subsequently informed the defense, the Victim Company responded that it possessed no additional records within the scope of the requests as ordered by the Court.

The government anticipates that the defendants may attempt to defend this case on the same basis:  that the Victim Company is cooperating with the prosecution.  However, such allegations are irrelevant to the defendants' guilt and would only serve to confuse the jury, complicate this matter, and waste time.  Such inquiries and argument should therefore be precluded from the trial of this case.  *See* Fed. R. Evid. 401, 403 (to admissible, evidence must bear on the resolution of an issue material to determining the action).  Here, whether the defendants should be convicted depends on the elements of the several counts against them:  that is, whether they engaged in a scheme to defraud; whether they intended to defraud the Victim Company; whether the reached an agreement to conduct the scheme; and so on.  Whether or not the victim of the scheme cooperated with the government's requests, or indeed, whether the victim declined to do so, does not satisfy any element or aid in answering any issue in the case.  Indeed, it could be argued that the victim's cooperation tends to prove the defendant's guilt, at least as much as it suggests the opposite.  Since the extent of the Victim Company's cooperation – or lack thereof – with the investigation does not aid in the actual determination of a material issue, it is irrelevant and should not be offered or discussed before the jury.

Permitting questions of witnesses about the extent of the victim's cooperation with the government, or even unsubstantiated argument or innuendo about the matter, would merely serve to confuse the jury and prolong the proceeding. Allowing the defense to cross examine witnesses about whether the Victim Company cooperated with the government's investigation or even generally supported the prospect of convictions is unrelated to the defendants' actual guilt of the crimes alleged in the indictment. Where inquiries do not relate to the elements of the offenses, they are improper. *See United States v. Robbins*, 197 F.3d 829, 845 (7th Cir. 1999) (affirming trial judge's refusal to have the "trial become a trial of the investigation."). The conduct of the investigation is a "tangential issue that could confuse the jury." *See United States v. Estell*, 2016 WL 909185 (7th Cir. 2016).

Extending this trial to allow cross-examination on such an irrelevant subject would neither efficiently try the case nor advance the interests of justice in this matter. For while the defendants are entitled to a defense, the victim is not required to defend its own conduct in seeking justice for the crimes against it. All such questions and arguments are therefore irrelevant and under Rules 401 and 403 should be precluded in this case.

### E.    Summary Testimony and Charts

The government intends to call law enforcement agents to testify as summary witnesses in its case-in-chief. "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination." *United States v. Ellefsen*, 655 F.3d 769, 780 (8th Cir. 2011) (quoting *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980) (permitting IRS Revenue Agent to

testify as summary witness that management fees at issue in tax evasion case constituted constructive dividends)).

In addition, because this case involves voluminous documentary evidence, including bank records, corporate records, payroll records, and other financial documents, the government intends to offer summary charts into evidence to assist the jury.  Summary charts are properly admitted when (1) the charts fairly summarize voluminous trial evidence, (2) they assist the jury in understanding testimony already introduced, and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summaries.  *United States v. Spires*, 628 F.3d 1049, 1052-53 (8th Cir. 2011) (citing Fed. R. Evid. 1006); *see also United States v. Boesen*, 541 F.3d 838, 848 (8th Cir. 2008) (holding charts summarizing clinic's revenue stream were properly admitted into evidence in health care fraud trial).  "Also, summaries may include assumptions and conclusions so long as they are 'based upon evidence in the record.'"  *Spires*, 628 F.3d at 1053 (citation omitted).

### F.    Motion for an Order to Sequester Potential Witnesses

The government has moved to sequester potential witnesses except for the government's case agents, Special Agent Kurt Beulke and Forensic Accountant Eric Robertson.  Federal Rule of Evidence 615 allows the exclusion of witnesses at the "request of a party."  This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be

present.  Government agents and fall within the exceptions to this rule.  *United States v.*

*Sykes*, 977 F.2d 1242, 1245 (8th Cir. 1992).

Dated: September 8, 2022                          Respectfully submitted,

                                                 ANDREW M. LUGER
                                                 United States Attorney

                                                 */s/ Michelle E. Jones*

                                      BY:  MICHELLE E. JONES and
                                            ROBERT M. LEWIS
                                            Assistant U.S. Attorneys